Good morning, and may it please the Court, David Shimano on behalf of HAR-BD on our two morning bankruptcy appeals. The first one presents the following issue. DBD, the senior secured creditor, was owed $52 million on the petition date. During the bankruptcy, it received $60 million from the sale of the property and then received another $24 million from the guarantor for a total of almost $84 million. The question is, did that collection of $84 million fully satisfy its $52 million claim in the bankruptcy case? There are two issues for the Court to decide. The first is how to account for the collection of post-bankruptcy interest from the non-debtor guarantor with respect to the claim against the bankruptcy estate. This issue was directly addressed by the Fourth Circuit in the natural gas and energy case, and it held that while the creditor can allocate post-petition interest against the guarantor however it wants with respect to its claim against the debtor, it must be applied to the claim against the debtor as a matter of bankruptcy law. That decision was followed in the ground improvement decisions by both the District Court of Nevada and a prior panel of this Court. All we are asking is that this Court follow the logic and rationale of the Fourth Circuit in natural gas. The point I want to emphasize this morning on this is the following. Both parties cite the Ivanhoe case, a Supreme Court case from the 1930s. That case does not directly address this issue, so we can't look to it to control the decision, but it's a very- Explain why not, because I think maybe it does address this issue. Explain why you think it doesn't. It addresses a partial payment, how it's counted for against the debtor until there is full payment. Once there's full payment from any source, it fully satisfies the claim. Ivanhoe doesn't answer when the claim is fully satisfied. If sources outside the bankruptcy don't count, I'm not sure why that matters. The claim, the collection from the non-debtor matters in calculating whether the claim is fully satisfied. As a matter of further distribution in the bankruptcy case, if it's a complete payment by the guarantor, the claim is fully satisfied. Ivanhoe is dealing with a partial payment, so if there's a partial payment, how is that accounted for for future distributions in the bankruptcy case? Ivanhoe just sets a rule. For bankruptcy cases, a partial payment does not reduce the denominator of the creditor's claim for purposes of future distribution, but once from either source, fully paid, the claim is satisfied. So it doesn't really answer the question, when is it satisfied if you're collecting post-judgment interest? The importance of Ivanhoe is the following. Ivanhoe, in analyzing that issue, it was before them, made absolutely no reference to state law. It decided, it analyzed the issue as purely one of bankruptcy law and bankruptcy equitable principles and the text of the Bankruptcy Act at the time. It did not look to state law, and that's what the Fourth Circuit did as well in the natural gas and energy case and the grant improvement decisions. They looked at federal bankruptcy law to try and analyze this issue of how do we determine when a claim is fully satisfied. Council, what is that federal bankruptcy law? Is it a statute that you're referring to? Is it equitable principles? What is it? Fourth Circuit cited 502. 502 is very bare bones. It just says you can't collect unmatured interest on the claim. It doesn't speak to allocation of monies received from a guarantor. No dispute that the bankruptcy code itself, the text, does not answer the question. If it's not the text, what is it? Well, it's the doctrines and equitable principles that are embedded in the bankruptcy code system for 100 years plus, and that's what the Fourth Circuit said. If we look at 502B, which says no unmatured interest, why is that rule there? Well, that's the codification of an older rule that tried to equalize treatment of creditors who have various rights. Some creditors have the right to post interest. Other creditors don't. We have to have an equitable rule that treats all creditors fairly, and that's going to inform our decision. The Fourth Circuit basically came out with a rule. You have to have a rule. You've got to pick a rule. They said this is the most equitable rule, and we explain why in our brief we think it is most equitable rule. The Fourth Circuit's decision seems to be based on facts that there was inequitable conduct, and not just inequitable conduct in the sense of a creditor having two sources of money, and it's unfair to not account for that fact, but inequitable conduct and bad behavior, and that's why they talked about equity stepping in to remedy that circumstance. We don't have those facts here, as far as I can tell, so why isn't that a distinguishing factor between our case and the Fourth Circuit case? First of all, I don't believe the Fourth Circuit decision was informed at all by any inequitable conduct by the creditor. The creditor enforced its rights. It was governed by its guarantee, and it came back to the bankruptcy court and asserted its claim, and the Fourth Circuit made a rule, and again, the ground improvement decision, again, there's no issue of inequitable conduct. The point I want to make is when the bankruptcy court, when it made its decision, disagreeing or not following natural gas, it cited solely state law. The bankruptcy judge said, well, state law says the creditor can allocate the payment however it wishes. That ends the inquiry, and I'm just pointing out that if you look at Ivanhoe, you look at natural gas, you look at ground improvement, that's not how they analyzed it. They said, yes, state law says what it says, but this has to be analyzed under bankruptcy law and bankruptcy equitable principles. We think what we're proposing is the best, fairest result, which is they can collect post-petition interest to the maximum amount from the guarantor, but to be fair to all the other creditors of the bankruptcy estate, it just has to be credited against the claim, and that's the fairest result, and we just ask the court follow that and not create a circuit split, and that's our proposal to you. If I may, I may go to the second argument because it's just as important, because I only need you to agree with me on one of these two, so the second one is just as important, and that's the question of how do we allocate, how do we account for the receipt of a carve-out? Again, the issue is whether their claim was reduced by $60 million inclusive of the carve-out or exclusive of the carve-out by $56,250,000. As we predicted in our opening brief, they do not defend the lower court decisions, so we can actually say this morning that the lower court decisions are indefensible. Their argument is different. Their argument is, well, yes, maybe our claim was reduced by $60 million, but you see, we had the right to add the carve-out amount back against Ms. Kaufman under our guarantee loan documents. That's their argument, and as we pointed out, they did not brief that to the bankruptcy court. The district court made no reference to it, and despite ample opportunity, they have not cited a single provision of their loan agreements that give them the right to add the carve-out amount back to the claim against Kaufman, and what I would like to emphasize is the following. I'm going to refer the panel to the following pages in the excerpts of record, pages 431, 478, and 481. Those pages are from briefs that DBD submitted to the state court when they calculated their claim against Kaufman, and contrary to what they're saying now to you, there's nothing in those briefs that says, oh, we collected $60 million from the debtor, but we can add 3.75 back against our claim against Kaufman. That is not the argument that was included in their briefs. Even if we agree with you about the carve-out, and I think there's this additive or subtractive, even if we agree with you that it has to be, I think, additive, why doesn't the post-petition interest cause a problem for you? Because the answer is because, and I don't think there's any dispute about this between the parties, is that if you don't include the reduction of their claim by 60, only 56-2, in their calculation it came against Kaufman, including the post-petition interest, and you allow them to collect post-petition interest and not credit it against the claim against the debtor, they were still overpaid by millions of dollars. But this gets, you said in your transition between the two points, I think you said you only have to agree with us on one, but I think you're now saying you have to agree with us on both, right? We have to assume that the guarantor, the money from the guarantor matters here to get you out of the, or something. You have some problem, I think, with the post-petition interest and why they don't get post-petition interest from the escrow. With respect to the, if you disagree with the Fourth Circuit and you create your split, they're entitled to collect post-judgment interest, petition interest, and not apply it to the claim against the debtor. Let's assume that. So they collected $24 million from Kaufman. Their calculation of their total claim against Kaufman, including post-petition interest, was $25 million, okay? So they got 24. If their claim was actually reduced $60 million and not $56,250, right? There's a $3.75 million spread. That means that they were overpaid by Kaufman, even assuming they were entitled to collect post-petition interest and not apply it to the claim against the debtor. They still were fully satisfied by Kaufman by several million dollars because they had understated the reduction of the claim against the debtor. I don't think there's any dispute about that. That argument is based on the premise that by negotiating in bankruptcy to have their claim be $60 million, that that also negotiated away rights that they had against the guarantor under their guarantor contract. I'm not sure I'm following that. What am I missing there? Because it seems like you do things in bankruptcy because bankruptcy world is different than just your contracting world, but that doesn't mean that the choices that you make in bankruptcy necessarily undermine things that are not in bankruptcy and the guarantor is not in bankruptcy. I 100% agree with you, but California law says, and we cite the statute, we'll apply state law for a second. Any receipt of partial payment by the primary obligor correspondently reduces the claim against the guarantor in the exact same amount. That's California law. That's the law under state law. If they want to add back the carve out, they want to say, oh, this is a collection expense. We are entitled to collect it against the guarantor. They have to have some contractual basis to do that. It's not, they say no case law that they can do it. They don't cite any statute. They can do it. It would have to be under their loan agreements and they have never cited a single provision of any loan agreement with Kaufman that allows the claim against Kaufman to be reduced under state law by $60 million. That's what California civil code says. And then added back as a contractual collection expense. I mean, I don't, I'm not sure, maybe I'm not getting the math right, but I'm not sure that that matters here because the, what they were owed under their contract is more than 60 million plus the carve out. It's more than that. And so that additional is what the guarantor is on the hook for. Their claim against the debtor indisputably was capped at the value of the collateral, $60.5 million. No dispute about that. They collected 60, if you agree with me, inclusive of the carve out, that left a remaining claim of $500,000. They collected $24 million from Kaufman. If they were not, if the post petition, that includes post petition interest and attorney's fees. If on point one, it has to be $60 million, not 56.2, we still win because their claim, when they told the state court, we were still owed $25 million. That was factually wrong. They were only owed $22 million. They overstated the amount owed by Kaufman because they didn't take into credit the reduction of the carve out. They said our claim was reduced net of the carve out. That's what they told the state court. So they said 25 million were owed. They got 24, but as a matter of fact, they were only owed less than $22 million. That's why we win. To the extent I'm tracking the argument, and I'm not sure I'm 100% tracking the argument. I guess I'm left with the question of even if Kaufman overpaid, I don't know what that does to your client. That doesn't necessarily mean your client would have gotten more money in the bankruptcy. Why would you care if the guarantor overpaid if it isn't going to impact your client? We're the junior secure creditor. The $500,000 sitting in the pot is our collateral. We get it if their claim is fully satisfied. That's the issue. Did the payment by Kaufman of $24 million satisfy that remaining $500,000 claim? It did if we're right about either one of these two facts. I'd like to reserve some time because I see that there's some confusion, and maybe we can clarify it in rebuttal. Let's hear from the other side. Thank you. Good morning, Your Honors, and may it please the court. David Carpenter on behalf of DVD Credit Funding. I think the questions the court are asking are the right questions. There are two simple propositions that control the outcome here. First is Ivanhoe, which states that payments from a third-party source do not operate within the bankruptcy to reduce the amount of the bankruptcy claim subject only to double recovery, which has not occurred here because DVD has not been fully satisfied on the full amount of the loan obligations. The second principle is that you do look to California law, which is very clear that a guarantee is a separate and independent obligation from the borrower's obligations. That means that we can pursue the guarantee without impairment based on what happens in bankruptcy world, and indeed that is the very purpose of a guarantee. California law is further clear that we are entitled to allocate those guaranteed payments however we wish. Turning to the other side's arguments, just as a very brief overview, national energy one is factually distinguishable based on the peculiar circumstances of how those payments and the debtor-related payments were made in that case. It's also not legally controlling, both because it's not considering California law, but also to Judge Tong's point, there's no statutory text or textual basis in 502B for the decision. 502B simply speaks to the amount of the allowed claim. It does not speak to allocation. We then hear this idea of an appeal to equity, but the guarantee that DVD has does not exist for Harvey D's benefit or the benefit of any other creditors. If we did not have the guarantee, there is no dispute that DVD would be entitled to those escrowed proceeds, and Harvey D would be in no worse position than it is today with or without the existence of the guarantee, and that's part of the reason why, again, the guarantees exist to give these lenders additional rights. I'll add in another aspect of equity here, which is the whole reason this loan happened from DVD. A major purpose was actually to pay down a very significant portion of the debt that the borrower owed to Harvey D. It's about $19 million you see reflected in the loan documents. DVD would not in any world have made that loan in significant part to Harvey D's benefit if it didn't have that guarantee in hand, that ironclad guarantee in hand, and Harvey D knew this was the arrangement. It knew the guarantee was in place, and it actually accepted its position as the junior most subordinated creditor because of this waterfall series where it's DVD first, then Kauffman as the guarantor, and then Harvey D. So it knew full well what it was getting into when these loans were made and the position and the risks that it was assuming. Counsel, does that fact distinguish our case from the Fourth Circuit's case? I think that is a significant fact if we're going to talk about sifting the circumstances, looking behind the transactions. That's what the Fourth Circuit's talking about, right? That's how it kind of gets to it when it says we need to look at what's really on. I think a significant aspect of national energy was the fact that you have the debtor with these energy contracts that were guaranteed by the debtor parent and then a subsidiary, and the way they manufactured that payment was they had the debtor guarantor spin off the sub within the context of the bankruptcy, and then it took the money from that sub sale, and then with the bankruptcy's permission, the bankruptcy court's permission, used that as a payment. So all of that was happening, the transactions between the debtor parent guarantor, the spin off, the sale, the allocation was all happening within the bankruptcy world, which I think is one of the reasons why national energy felt it could kind of do what it did looking behind those transactions. Here we have a true third party guarantor operating entirely outside of the bankruptcy. So if we, I understand that argument, but if we disagree with that argument and we think that the Fourth Circuit was really dealing with a guarantor outside the bankruptcy, tell me why you think it's wrong anyway and we shouldn't follow it. I think you can turn to the dissent where it lays out very clearly that these are separate and independent obligations, how a claim works against the borrower in bankruptcy and your ability to pursue a guarantee outside of bankruptcy. I think Ivanhoe is very clear about that right and that you don't need to reduce the amount of the claim. I think it goes to the heart. Do you think this argument that it has to do with partial payment instead of full payment distinguishes Ivanhoe? No, because we don't have complete satisfaction of our debt under any circumstances. The full guaranteed obligations are much, much higher. We have never actually been made whole because in part these are real litigation costs and real enforcement costs that we incurred because of a litigious borrower, very, very litigious borrower, and a very, very litigious guarantor. And that's really what drove up these costs and again that's why a guarantee exists so that no matter what happens in the bankruptcy, no matter what discharge or reduction or impairment of rights you can get against the borrower, you can still go after the guarantor and that you have the indemnification of the guarantor for those expenses for those enforcement costs. I think I've mentioned I think just textually is another reason why national energy kind of goes off the rails because 502b clearly does not speak to allocation at all and for the equity reasons we stated here that guarantees like this do not exist for the benefit of parties like RBD. So under your view we don't really need to decide which law governs either federal or state because they yield the same results? Yes, I think that's correct. I don't think there is a there is truly a federal law that speaks to the allocation requirement in this context, but generally speaking bankruptcy courts will honor state law as it relates to the rights against third parties. I mean and I'll note here that to adopt their view really does it diminishes the power and the utility of guarantees. It takes away a lot of the purpose of that. Guarantees exist to facilitate the making of loans notwithstanding the risks of a borrower being bankrupt. So you're actually tightening up capital if you accept this view. A similar point is made as to the carve-out. There is no authority to suggest that a carve-out, which is really a sort of a structure within the bankruptcy world to reduce the claim against the borrower, would ever operate to actually reduce the obligations of the guarantor. We know that Kaufman herself never made that argument presumably because she never viewed the carve-out as actually reducing her obligations. I'll note a further kind of funny wrinkle here is that although Harvey D. is standing here, Harvey is actually standing in Kaufman's shoes. If you look at the district court's order on page 601 ER6 note 8, it notes that Harvey D. is here because it got an assignment of Kaufman's right to the escrow proceeds. So the argument about the carve-out is actually that Kaufman misunderstood her own obligations and now theoretically would have a right to those escrow proceeds because she overpaid in the state court, and obviously she did not. We have cited the range of guarantee provisions in the contract that all operate to the effect that the lender's rights are not in any way impaired by operation of bankruptcy law as the guarantor, they're not reduced by any discharge of the borrower's obligations, that costs of enforcing your rights in bankruptcy fold into the guaranteed obligations, and further that we are allowed to pursue Kaufman for all expenses incurred as a result of her breach. And that's clearly the case here. If Kaufman had stepped up in the first place and just paid the guarantee, DVD would be out. We wouldn't have had to go through the bankruptcy. We wouldn't have to go through and negotiate a carve-out. We would have just been paid. So everything that's flowed from here is truly part of DVD's attempt to enforce its rights, to make itself whole, and we didn't quite get there. And that's why we're entitled to the escrow proceeds. So I may have done the math wrong, but I thought that I probably disagreed with you about whether the carve-out should be subtractive versus additive. So let's say it's additive. I was thinking that you were still going to win on the math in terms of the post-petition interest, like you were still going to get the money from the escrow because of that. Am I right or am I wrong? I mean, he says I'm wrong. So if you lose on that issue about how you consider the carve-out, can you still win on where the money goes? Honestly, Your Honor, I know there have been different numbers. There's like the $87 million number that's identified in the district court. I think based on that number, we still win either way. We have just been looking at it from the perspective of the differential between the state court judgment and the guarantee, which made it clear that we haven't been fully repaid. So I don't have an answer for you immediately on that point. I could walk through more. I mean, if you want, I know my colleague said we hadn't cited the specific provisions. If that would be helpful to you, I can give you the specific provisions on the guarantee that I think operate. But the basic point being that what we reduced in terms of Kauffman's obligations was the actual amount that we were paid. Like in the same way that the broker's commissions and the other costs of sale from the sale of the collateral were taken off the top, we traded the carve-out as, no, we're going to credit for Kauffman what we actually recovered, not this kind of bankruptcy world fiction where the carve-out gets reduced from Kauffman's allowed claim. But however you want to characterize it for the carve-out, that's either you only reduce it based on the net proceeds or you treat the carve-out as, well, that's just part of the damage that Kauffman caused because of her breach. We all get to the place with that treatment. What do you make of the argument made by your friend on the other side that you forfeited that argument? No, I mean, we did not. So I'll say this. The briefing evolved in the case below. And in fact, we have raised sort of a contrary argument to them that they actually forfeited it by not developing the carve-out theory in the first place. Their original brief was this sort of cursory reference to a surcharge principle under 502C. And so we respond to that, and that's what the bankruptcy court originally rejected, and properly so. I think as it then evolved going into the district court, and I think it argument, the rather intuitive and obvious point that the carve-out was part of the bankruptcy enforcement efforts. So no one expected or believed that it would reduce the guarantor obligation. As it evolved, we made the point more clearly for the district court in that appeal that no, the carve-out was kind of part of the bankruptcy enforcement process. It does not get credited to the guarantor. And then, you know, it's kind of further developed here. So we've made the point all along. I think the core issue being that just as a matter of logic, you would not have a bankruptcy carve-out work for the guarantor's benefit. I think that really defeats a whole purpose and structure and text of the guarantee, which is to make the lender whole no matter what stuff happens in bankruptcy world. I think you would also undermine the purpose of carve-outs in bankruptcy court. Because like carve-outs exist because they're trying to give the trustee and the senior creditor some flexibility. If I'm right though, your client consented to the carve-out. The carve-out is giving money, if I'm right, to the trustee and other professionals rather than giving that money to another secured creditor. So treating the carve-out as not coming out of your money lets you take money from another secured creditor and give it, jump ahead of people who aren't secured. Am I understanding that right? I mean, that's why I think you don't, you're not right about this carve-out, but tell me why I'm wrong about that. Well, I can understand why then that's the principle of reducing the allowed claim in bankruptcy court. And that's why the carve-out works there. But that's separate from whether we can go recover that carve-out as against Kaufman, which is what we did. And she never disputed that we are allowed to do that. So it's, I mean, if that's correct, then from your perspective, do we even need to decide if the carve-out is additive or subtractive? No, you do not. Because the additives- I don't think that was made clear in the brief. Yeah, I thought, I thought that was true, but it was because of the post-petition interest, but maybe, maybe it's true for some other reason. I mean, I sort of thought which way the carve-out went wasn't going to matter very much because of the post-petition interest, but you seem to have some different theory about why, but I'm not sure I'm understanding yet why it doesn't matter. So it doesn't matter whether it's additive or subtractive of the bankruptcy claim, because it doesn't affect our ability to go after Kaufman. Because the delta between what you're going to recover in bankruptcy and what the guarantee is, is bigger than the carve-out. Correct. Correct. Yes. So we, we, we agree. I think we can get there multiple ways, but we agree that ultimately the treatment of the carve-out under the academic theories is, is immaterial. But, but I would also further- Counsel, so if we find in favor of your friend on the other side with respect to the carve-out, you can still go and pursue that amount from Kaufman. Correct. Yes. Nothing, what we do here on the carve-out is going to affect your ability to, to pursue against Kaufman. That's correct. And that's, that's what we're seeing, you know, what are we doing with this second question? Maybe we don't need to decide it. Right. And that's what was, what was reflected in the judgment and incorporated and accepted by Kaufman herself. And again, in, in her shoes that Harvey D stands. Okay. We have you over your time. Let's put a minute on the clock for rebuttal, please. Thank you. Very brief on the first issue. Again, Ivanhoe, I was entirely begging the question. Ivanhoe rule applies until full satisfaction from any source. That's the question on appeal. Was their claim fully satisfied from any source? And again, Ivanhoe, no reference to state law. We look at bankruptcy principles. That's what the fourth circuit did. That's what was done in ground improvement. Let me go to the carve-out issue because I would really hate to lose this appeal because of a misunderstanding about what's going on. They had a 60 million point five claim in the bankruptcy. That's not disputed. They told based upon a reference, an argument to the state court, which admittedly Kaufman did not dispute that their claim was reduced in the bankruptcy, only 56 to five, not 60 million. They got effectively a judgment that they were owed $25 million and Kaufman paid 24, leaving a gap, right? There's like a million dollar differential. That's the basis of them coming back to the bankruptcy court and saying, oh, we're still owed a million dollars. Therefore that 500,000 is ours. If on the other hand, they overstated the claim so that in fact, their claim was not $25 million. It was 25 minus 3.75. That was their claim, including post-petition interest, including every dollar of attorney's fees, the millions. That's okay. If their claim actually only was 21,000,250 and they got 24 million from Kaufman, they were overpaid several million dollars. And between them and Kaufman, that's between them and Kaufman. They signed a release and Kaufman can't go back and get it. That's too bad for Kaufman. But for my client, who's asserting a claim against the 500,000, I can point to that and say, they were fully satisfied from another source. There's no estoppel effect on my client. We're not a party to that other litigation. And if we're entitled to do the accounting, if your claim was actually 21,000,250, not 25 million, and you received 24 million against Kaufman, you were fully paid. That's the issue. And they don't really dispute that. Their argument as developed as they came up with a post hoc rationalization to try and justify their argument, oh, we can add the 3.75 back against Kaufman under our loan documents. And as I keep on repeating, and I ask you just to go look at the record, there is nothing in the loan documents that allowed them to do that. Simply saying they can do it, simply saying that that's what guarantees do, that's not evidence, that is not true argument. Do you have a question? Yeah, go ahead. Why don't we treat the carve out amount as a cost of going through the bankruptcy enforcement process? Two reasons. Okay, there's a contractual reason. It's explained in the briefs. If you look at the carve out agreement itself, they identified the cost of sale as prior to the carve out. That's how they characterized it in their own agreement. The cost of sale was the broker and the escrow fees. Then you get the net proceeds and it's allocated between DBD and the trustee. So they didn't treat it as a cost of sale in their own carve out agreement. What if it's a different kind of cost? I mean, you can characterize it differently, trying to understand the substance of the payment. That was the ruling by the bankruptcy judge. The bankruptcy judge said, your claim was only reduced 56 to five because a carve out is a cost of sale. That's the question before you. That doesn't make any sense. A carve out, we're the junior secured creditor. We have a lien. It can only work if conceptually, conceptually, DBD got the money. They got $60 million and in their own free will, they could give it to charity. They could give it to this court. They can give it to whoever they want. They decided to take some of their money and give it to the trustee. So the trustee would go do what they wanted him to do. You can't treat that as a cost of sale. That is simply them, carve outs work because that's their money. They can do whatever they want with it and it can't affect other, it can't prejudice other creditors. That's the issue on appeal. Isn't it a cost to get the transaction approved? You needed the trustee to do his or her work, to get the sale affected and the payment also needed to be made to the unsecured creditors because the carve out went, part of the carve out went to the trustee and another part went to the unsecured. Correct? It will blend into the next appeal. Yes, that's correct. That's why carve outs are acceptable in bankruptcy, but as to the effect. It's not a gift in the same way that giving it to charity is. This cost needed to be incurred. The motivation is obviously different. You're an economic actor, but for purposes of the calculation of the claim, they received their collateral and in their discretion, they did whatever they want with it. It can't prejudice junior creditors. That's the point of Richard Levin's article. You can't push, you're right, you can't push other creditors down the waterfall because you get a benefit of you induce the trustee to sell the property instead of you having to do a foreclosure. It can't reduce, it can't prejudice other creditors. That's the deal. You get to do it. You can do a carve out, but you can't prejudice other creditors and that's why they, it's indefensible with a bankruptcy judge. They don't defend it. They don't defend it. They fall back on the argument that, oh, we have a contractual right to add it under the loan documents. Please look at the record. It's not there. Thank you very much. Thank you both sides for the helpful arguments. This case is submitted.
judges: FRIEDLAND, FORREST, TUNG